SYNTHETIC ORGANIC CHEMICAL MANUFACTURERS ASSOCIATION et al., Petitioners,

v.

Peter J. BRENNAN, Secretary, Department of Labor, and John H. Stender, Assistant Secretary of Labor for Occupational Safety and Health, Respondents.

OIL, CHEMICAL & ATOMIC WORKERS INTERNATIONAL UNION, AFL–CIO, and Health Research Group, Petitioners,

v.

Peter J. BRENNAN, Secretary United States Department of Labor and John H. Stender, Assistant Secretary Occupational Safety and Health Administration United States Department of Labor, Respondents.

POLYURETHANE MANUFACTURERS ASSOCIATION, Petitioner,

v.

DEPARTMENT OF LABOR et al., Respondents.

Nos. 74–1129, 74–1149 and 74–1268.

United States Court of Appeals, Third Circuit.

Argued Oct. 21, 1974.

Decided Dec. 17, 1974.

Certiorari Denied March 17, 1975.
See 95 S.Ct. 1396.

Robert C. Barnard, Donald L. Morgan, Charles F. Lettow, Eric Schwartz, Washington, D. C., for petitioners in No. 74–1129; Cleary, Gottlieb, Steen & Hamilton, Washington, D. C., of counsel.

Bertram Robert Cottine, Alan B. Morrison, Washington, D. C., for petitioners in No. 74–1149.

Arvid A. Sather, Michael, Best & Friedrich, Madison, Wis., for petitioner in No. 74–1268.

Carla A. Hills, Asst. Atty. Gen., New York City, Stephen F. Eilperin, Michael H. Stein, Dept. of Justice, Washington, D. C., for respondents; William J. Kilberg, Sol. of Labor, Benjamin W. Mintz, Associate Sol. for Occupational Safety & Health, Michael H. Levin, Dept. of Labor, Counsel for App. Litigation, Steven F. Witt, Washington, D. C., of counsel.

Before HASTIE, GIBBONS and WEIS, Circuit Judges.

## OPINION OF THE COURT

WEIS, Circuit Judge.

The important subject of OSHA's regulations on the usage of a group of chemicals labeled as carcinogens occupies us once again. Although most of the standards are sustained, those as to laboratory practices and medical examinations of employees must be remanded. We also find validity in the objections by one of the appellants that the Secretary of Labor erred in not publishing a proposed regulation after receiving the report from his advisory committee.

These are companion cases to Synthetic Organic Chemical Manufacturers Association v. Brennan, 503 F.2d 1155 (3d

Cir. 1974), consisting of appeals from occupational health standards promulgated by the Secretary of Labor. These permanent regulations were issued on January 29, 1974, regulating, *inter· alia,* the exposure of employees to fourteen chemicals found to be carcinogenic. 29 C.F.R. § 1910.93c–p.

Appeals to this court were filed on behalf of employers who utilized four of the chemicals—EI, CMME, DCB and MOCA. Another appeal was filed by the Oil Chemical and Atomic Workers Union from the standards applicable to all fourteen substances. The appeal as it pertained to Ethyleneimine (EI) was severed, and we held in the prior opinion that the Secretary had made sustainable determinations as to the chemical's carcinogenicity and proper standards for industrial usage. We concluded, however, that proper notice had not been given before promulgating regulations for the use of EI in the laboratory and remanded on that point. Our conclusions as to the legal issues presented by the earlier case likewise apply to the appeals now under consideration and we need not repeat what was said in our prior opinion.

■ The contentions made here with respect to 3,3'-dichlorobenzidine (DCB) by employers who utilize it are similar to those raised in connection with EI—that is, the data derived from tests revealing carcinogenicity in animals were not properly extrapolated to human susceptibility. Nothing in the record permits a differentiation here from our earlier decision on EI, and we do not make one. While the scientific data varies, of course, the same legal principle applies

and, accordingly, the petitioners' contention must fail.

The thrust of the opposition to the standard regulating chloromethyl methyl ether (CMME) is aimed at certain studies relied upon by the Secretary. The employers contest the validity of the Van Duuren studies [1] by questioning whether pure CMME was tested or whether, as usually occurs, the substance was contaminated to form bis chloromethyl ether (BCME).[2] Again, the issue is the same as that in the EI appeal, and again in this case the Secretary's determination finds adequate support in the record.

Polyurethane Manufacturers Association (PMA), the employers' association concerned with the use of 4,4' methylene bis (2-chloroaniline) (MOCA)[3] in various manufacturing processes, presses the same arguments as to carcinogenicity that are advanced for DCB and CMME. Of necessity, the same criteria of review is applied to this chemical as the others in question. The Secretary's determination is supported by the record and therefore must be sustained.

PMA, however, raises one additional contention not presented in the other appeals. It challenges the procedures followed by the Secretary in promulgating the permanent standards for the industrial use of MOCA. This contention has merit and requires that the case be remanded to the Secretary for compliance with the statutory mandate.

MOCA was subject to the same emergency standard that was issued by the Secretary for the other thirteen chemicals on May 3, 1973 although PMA ap-

---

1. Van Duuren studied the properties of BCME and CMME and, in 1968, produced the first evidence for the carcinogenicity of these haloethers. His experiments employing both skin applications and subcutaneous injections led to the conclusion that, in the presence of certain other re-agents, and under some circumstances acting alone, CMME and BCME caused lesions in animal subjects. In each instance, Van Duuren verified the purity of the CMME used through I.R. and GLC analysis, showing no BCME content.

2. BCME is a potent chemical which industry concedes is carcinogenic. It appears that at the present time production of pure CMME is not commercially feasible. In industrial usages, it rapidly decomposes in air and aqueous solutions to form BCME and, therefore, there is no widespread usage of pure CMME now.

3. MOCA is the trade name utilized by duPont, although the same chemical is used by other industrial chemical concerns. We use the MOCA trade name because of its simplicity, but it should be understood that we are referring to the chemical, 4,4' methylene bis (2-chloroaniline).

parently did not become aware that MOCA was to be included in the group until the emergency standard was published. Thereafter, the Secretary instituted procedures to enact a permanent standard. According to 29 U.S.C. § 655(c)(2) and (3), once an emergency temporary standard is enacted, it is effective until superseded by a permanent standard fashioned in accordance with the procedures prescribed in § 655(b). The emergency standard serves as a proposed rule for that proceeding and the permanent standard must be enacted within six months. The legislative history emphasizes that "upon publication of such an emergency temporary standard, the Secretary must begin a regular standard-setting procedure." 1970 United States Code Congressional and Administrative News, p. 5184.

We now turn to the requirements of § 655(b). That section provides that the Secretary may request the recommendations of an advisory committee to which he may submit his own proposals as well as pertinent factual and research data. The committee than submits its recommendations to the Secretary within a specified time. Paragraph (2) provides that the Secretary shall publish a proposed rule and that interested parties be given the opportunity to submit written data, comments or objections to the proposal within thirty days. If an advisory committee has been appointed, the Secretary is to publish the proposed rule within sixty days after the submission of the committee's recommendations. Paragraph (3) provides that, if objections are filed to the proposed rule and a hearing is requested, notice of the hearing shall be given within thirty days of the last date for filing objections.

With these guidelines in mind, it is appropriate to review the chronology of the proceedings here:

4. On September 6, 1973, PMA sent a telegram to the Assistant Secretary of Labor urging that the hearing set for September 11 be cancelled and requested that a proposed rule be published pursuant to § 655(b)(2) together with an allowance of thirty days to file comments.

May 3, 1973—The emergency temporary standard was issued.

June 19, 1973—The Secretary announced the formation of an advisory committee.

July 16, 1973—The Assistant Secretary of Labor published a notice of "Commencement of rule-making proceeding," stating that the emergency standard of May 3, 1973 was proposed to be made permanent.

July 27, 1973—The Assistant Secretary published a revision of the emergency temporary standard.

August 16, 1973—An amended notice of proposed rule making was published to reflect the revision.

August 27, 1973—The advisory committee submitted its recommendation to the Secretary.

September 7, 1973—The committee's recommendations were published.

September 11–14, 1973 [4]—Public hearings were held. Additional comments were received until September 28, 1973.

January 29, 1974—The permanent standard was published as to MOCA, with separate regulations for the thirteen other substances.

The procedures followed here did not comply with § 655(b). The proposed rule was published before the advisory committee had submitted its report. Consequently, the parties were not given adequate time to submit comments or to prepare for the hearing after the committee's work was completed. Had § 655(b) been observed, under the most expeditious of circumstances, the hearing could not have been held earlier than thirty days after the advisory committee had submitted its report to the Secretary.[5]

5. This schedule assumes that the Secretary published the rule on the same day that he received the recommendations of the advisory committee. Obviously, if he is to give any consideration to the advisory committee report, the period must be longer. In the cases at bar, only four days elapsed between the dates of publication and hearing.

■ The Secretary contends that this timetable does not apply when an emergency standard has been issued since § 655(c)(3) states that the emergency standard shall serve as a proposed rule for the paragraph (b) proceeding. If no advisory committee is appointed, paragraphs (b) and (c)(3) are consistent but when an advisory committee does function, there is a conflict between the two statutory provisions. It is our conclusion that paragraph (b) must prevail. As we said in Dry Color Manufacturers' Association v. Department of Labor, 486 F.2d 98, 104–105 n. 9a (3d Cir. 1973):

"The courts should not permit temporary emergency standards to be used as a technique for avoiding the procedural safeguards of public comment and hearings required by subsection 6(b). Especially where the effects of a substance are in sharp dispute, the promulgation of standards under subsection 6(b) is preferable since the procedure for permanent standards is specifically designed to bring out the relevant facts."

While that comment was made in another context, its underlying philosophy is pertinent.

■ If we were to hold that paragraph (b) does not apply, then the purpose of convening an advisory committee would be subverted. A rule which the committee was to assist in formulating would have already been published and the committee's function would be re-

duced to merely preparing comments to a proposal. This is not compliance with the statutory mandate that the committee shall submit its recommendations "regarding the rule to be promulgated." Congress did not intend a mere post facto role for the advisory committee because it provided that a proposed rule must be published within sixty days after submission of the committee's recommendation. § 655(b)(2).

We are not critical of the Secretary's decision to utilize an advisory committee in this instance. To the contrary, in view of the complexity of the problems, that procedure is highly desirable. See 1 Davis, Administrative Law Treatise § 6.03. However, the value of notice and comment from interested parties in a hearing for rule making was not realized in this case. As an example, the advisory committee was instructed that only one set of standards would be promulgated for all fourteen chemicals, despite the substantial differences in their properties and their industrial and laboratory uses.[6] After the public hearings had been concluded, however, the Secretary issued separate standards for each chemical.[7] Had the proposed rule recited the separate standards, the presentation of pertinent objections, comments and data would have made the public hearings far more valuable to all concerned.[8] Since the procedural requirements of the statute were not observed, the standards relating to MOCA must be remanded to

---

6. Some of the committee members objected to this directive and the Secretary recognized that there was some merit to their position by publishing a revision of the emergency temporary standard on July 27, 1973. 38 Fed.Reg. 20074 (1973). However, this revision did little to solve the problem and the instructions to the committee remained unchanged.

7. Much of the language, however, in the separate standards is merely duplication of that governing all of the other chemicals.

8. PMA, for example, says that the revision of July 27, 1973 permitted it to utilize open vessel processes. However, the report of the advisory committee, whose recommendations had to be geared to cover all fourteen chemicals, permitted only closed vessel operation. The permanent standards prohibited open

vessel operation. The Secretary contends that the revised definition of "closed vessels" formulated by the advisory committee and ultimately adopted in the permanent standard does permit certain open vessel operations involving MOCA. PMA questions this and asserts that had it been given the opportunity to meet the issues at a public hearing after being advised of the specific standard later adopted, it would have been able to develop the data to show that the unique properties of MOCA would permit safe operation in open vessels. We do not resolve that factual dispute here and merely point to it as an example of where compliance with the terms of the statute might have provided a regulation and standard more acceptable to all concerned.

the Secretary for appropriate action to correct the defects.

The Oil Chemical and Atomic Workers Union (OCAW) and the Health Research Group have appealed from the standards established for each of the fourteen chemicals. These petitioners assert that the standards are deficient because:

1. they fail to include a preformance standard mandating no measurable exposure to any of the chemical substances;

2. the Secretary erred in declining to require a permit system as a regulatory device;

3. no monitoring requirements were included in the final regulation; and

4. no specific tests were set forth as part of the requirements for medical examinations.

The first contention, suggesting that a no measurable exposure standard be used, presents the same difficulty in review as that discussed in the EI case. There, we pointed out that by extrapolating the testing on animal species to establish carcinogenicity in man, the Secretary was exercising a policy judgment rather than a purely factual determination.

Here, the Secretary stated that, while a safe level of exposure cannot be established by application of present knowledge, there is respectable opinion that such levels do exist and that a total ban on manufacture is the only complete guarantee of no possible exposure.[9] He recited that the intent of the standards is to reduce exposure of workers to the maximum extent practicable with continued use. The standards applicable to certain of the substances do provide that mixtures containing less than one per-

cent of the chemical would be exempt from regulation and in the other six the level is set at 0.1 percent.

As was aptly stated in Industrial Union Department v. Hodgson, 499 F.2d 467, 474 (D.C. Cir. 1974):

"... some of the questions involved in the promulgation of these standards are on the frontiers of scientific knowledge, and consequently as to them insufficient data is presently available to make a fully informed factual determination. Decision making must in that circumstance depend to a greater extent upon policy judgments and less upon purely factual analysis."

And in discussing the requirements of feasibility noted in § 655(b)(5),[10] the court said:

"Congress does not appear to have intended to protect employees by putting their employers out of business—either by requiring protective devices unavailable under existing technology or by making financial viability generally impossible."

We conclude that the action of the Secretary in setting exposure standards is a reasonable exercise of his judgment in the policy making sphere.

While the advisory committee recommendation favored a permit system,[11] the Secretary stated that a decision had been made not to adopt such a system. He wrote:

"The investigations and evaluations of thousands of work situations involving a carcinogen, and the completion of procedures, possibly including hearings, for the granting of permits, would require many years and the diversion of substantial resources, even if available, from other serious occupa-

9. 39 Fed.Reg. 846 (1974).

10. This section in part provides, "The Secretary . . . shall set the standard which most adequately assures, to the extent feasible, on the basis of the best available evidence, that no employee will suffer material impairment of health . . . ."

11. An employer would be required to apply to the agency for a permit before being allowed

to use the chemical. The permit would presumably not issue until there was a showing of compliance with appropriate standards. This type of regulation should be contrasted with the one put into effect, that is, permitting usage, but depending for enforcement upon inspections and sanctions for non-compliance.

tional safety and health considerations." [12]

Though there is much to be said for recently expressed concern about undue judicial deference to administrative expertise, this is an appropriate situation for such respect. The OSHA program is a vast one, but to interested parties one particular facet of its operation may understandably appear to be the most critical. The Secretary, however, who has the responsibility for allocation of the not unlimited resources entrusted for OSHA's operation, may differ. The court should defer to his opinion of what is a practical program which can be administered with some degree of speed and efficiency. We find no error in the Secretary's choice between methods of enforcement.

■ No provision for specific techniques of environmental monitoring are contained in the standards and OCAW objects to this omission. But in our view the Secretary has satisfactorily met this objection by requesting NIOSH [13] to develop, on a priority basis, methods for determining amounts of carcinogens in the work place. In effect the Secretary has deferred implementation of monitoring requirements pending further scientific development of methods for doing so. Such a decision is a pragmatic one which will not be disturbed by the court.

Finally, OCAW attacks the provisions for medical examinations because they do not prescribe specific medical protocols and diagnostic tests to be given employees who work with the chemicals. The advisory committee suggested that employers should provide a comprehensive history and physical examination consisting of diagnostic tests and periodicity specific to the carcinogen and in no less detail than guidelines set forth by the Secretary of Labor after consultation with the Secretary of Health, Education and Welfare.

During the rule-making process, evidence was submitted which established that the various carcinogens acted on different bodily organs and that particular tests were required for specific chemicals. This evidence was another instance of the problems engendered by considering all of the substances as a group rather than on an individual basis.

The Secretary gave no reasons for ignoring this recommendation of the advisory committee, nor did he indicate, as he did in connection with monitoring devices, that further information was needed.

29 U.S.C. § 655(b)(7) provides, *inter alia*:

"In addition, where appropriate, any such standard shall prescribe the type and frequency of medical examinations or other tests which shall be made available, by the employer or at his cost, to employees exposed to such hazards in order to most effectively determine whether the health of such employees is adversely affected by such exposure."

In contrast to the standards adopted here, certain diagnostic tests are required by the regulations pertaining to asbestos workers, *see* 29 C.F.R. § 1910.-93a(j)(2) & (3), and some specificity is evident in the medical examination requirements for employees who are exposed to vinyl chloride, 39 Fed.Reg. 35897 (1974).

At oral argument, counsel for the Secretary posited that the existing broad standards could be interpreted to require any specific diagnostic tests which might be necessary. But this approach introduces an element of uncertainty not satisfactory to either employee or employer. It is important that the worker be assured of the benefits of medical procedures that are presently available and that industry be advised of what is expected of it. The regulations can be drafted with ample flexibility to take advantage of expanding medical knowledge in the field. Specific provisions need not discourage improvement or innovation in this critical area.

12. 39 Fed.Reg. 846 (1974).

13. The National Institute for Occupational Safety and Health (NIOSH) was established within the Department of Health, Education and Welfare by 29 U.S.C. § 671.

The failure of the Secretary to explain the lack of specific requirements making the medical examinations effective requires that we remand this aspect of the standards applicable to all of the chemicals.

In summary then, the regulations applicable to 4,4' methylene bis (2-chloroaniline) (MOCA) will be remanded for the publication of a proposed standard, to be followed by the required procedures for allowance of comments and hearing. The regulations pertaining to laboratory usage of all the chemicals involved in these appeals are remanded so that appropriate notice may be issued to interested parties and opportunity provided for comment and hearing. The portion of the standards applicable to all of the chemicals referring to medical examinations will be remanded for further proceedings.