581 F.2d 960
 189 U.S.App.D.C. 182, 6 O.S.H. Cas.(BNA) 1721,
1978 O.S.H.D. (CCH) P 22,826
 NATIONAL CONSTRUCTORS ASSOCIATION, an unincorporated
association, Petitioner,
v.
Ray MARSHAL, Secretary of Labor, U. S. Department of Labor,
Eula Bingham, Assistant Secretary of Labor for Occupational
Safety and Health, and The Occupational Safety and Health
Administration, U. S. Department of Labor, Respondents.
 No. 77-1197.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 3, 1978.
Decided June 28, 1978.
 
 Steven R. Semler, Chicago, Ill., for petitioner.
 William G. Staton, Atty., U. S. Dept. of Labor, Washington, D. C., a member of the bar of the Supreme Court of Pennsylvania, was allowed to argue pro hac vice by special leave of this court, Benjamin W. Mintz, Associate Sol. for Occupational Safety and Health Administration, Washington, D. C., a member of the bar of the Supreme Court of New York was allowed to argue pro hac vice by special leave of this Court, with whom Michael H. Levin and Allen H. Feldman, Attys., U. S. Dept. of Labor, Washington, D. C., were on the brief, for respondent.
 Before LUMBARD*, Senior Circuit Judge for the Second Circuit, and McGOWAN and WILKEY, Circuit Judges.
 Opinion for the Court filed by McGOWAN, Circuit Judge.
 McGOWAN, Circuit Judge:
 
 
 1
 To bring power to electrical handtools and other equipment, constructors typically provide building sites with temporary electrical systems, often involving many feet of extension cords and large numbers of moveable outlets. Because the construction environment exposes this electrical transmission equipment, as well as the tools themselves, to severe wear and tear, accidental leakages of electricity and resulting electrical shocks, I. e., ground faults, present a significant threat to the safety of construction workers. In order to alleviate such dangers, the Assistant Secretary of Labor for Occupational Health and Safety promulgated and, more recently, modified certain "ground-fault circuit protection" standards that must be met on all construction sites using temporary electrical systems. 20 C.F.R. §§ 1910.309(c), 1926.400(h) (1977), As modified, 41 Fed.Reg. 55703-04 (1976). This petition challenges the recent modifications of those standards. Finding that the modifications were not promulgated according to the statutorily mandated process, we remand the record for at least ninety days to allow for correction of the defect identified hereinafter.
 
 
 2
 * By explicit provision in their promulgation notice, the modified safety standards were issued under the authority of two statutes. See 41 Fed.Reg. 55696 (1976). The first, the Construction Safety Act (CSA), 40 U.S.C. § 333, was passed in 1969 and authorized the Secretary of Labor ("the Secretary"), after Mandatory consultation with the advisory committee, and apparently after compliance with the formal rulemaking provisions in the Administrative Procedure Act (APA), 5 U.S.C. §§ 553(c), 556, 557, to establish health and safety standards that every contractor of a federal or federally financed building must meet as a condition of his contract with the government. 40 U.S.C. § 333(a). See S.Rep.No. 320, 91st Cong., 1st Sess. (1969), Reprinted in (1969) U.S.Code Cong. & Admin.News, p. 1073 ("formal hearings" required).[1]
 
 
 3
 The other statute is the Occupational Safety and Health Act of 1970 (OSHA), 29 U.S.C. § 651 Et seq. This much more comprehensive legislation authorizes the Secretary of Labor to establish workplace standards aimed at improving and preserving the health and safety of all American employees involved in commerce among the several states. 29 U.S.C. §§ 651, 652, 655. The relevant procedural requirements for promulgating and modifying those standards provide first that the Secretary May submit his proposal to an advisory committee. If he does, he is then bound to furnish the committee with certain information and to await its recommendation for a specified time period. 29 U.S.C. § 655(b)(1).
 
 
 4
 The Secretary must, in any event, publish, and accept comments on, the proposal to promulgate or modify a standard. Id. § 655(b)(2). OSHA does not explicitly refer to the APA, and its promulgation procedure is a hybrid of informal and formal rulemaking. Thus, while a pre-promulgation hearing is required if requested, and is reviewable under the substantial evidence rule traditionally applied to formal rulemaking, the hearing may be informal (I. e., without cross examination, adversary presentation, and detailed findings).[2]
 
 
 5
 As this synopsis of the two statutes suggests, Congress provided similar but not identical promulgation procedures for health and safety standards under CSA and OSHA. Under the former, advisory committee consultation at some point is mandatory, and formal rulemaking is apparently required. Under the latter, pre-proposal consultation with an advisory committee is merely elective, and an informal hearing will suffice. Nonetheless, the Secretary has devised a single promulgation process for construction industry standards aimed at satisfying the requirements of both statutes; and it is the Labor Department's faithfulness to this process that is at issue herein.[3]
 
 
 6
 Under this procedure, the Assistant Secretary of Labor for Occupational Safety and Health ("Assistant Secretary") is delegated the Mandatory duty of submitting to an Advisory Committee on Construction Safety and Health ("the Advisory Committee" or "the Committee") "Any proposal . . . together with all pertinent factual information available to him . . . ." Within an established time period, the Committee may make a recommendation to the Assistant Secretary.[4] Once that period has expired, or the Committee has issued a recommendation, the Assistant Secretary may propose a health and safety standard; if he does, he must solicit public comments and provide an informal hearing thereon. 29 C.F.R. §§ 1911.10, 1911.11(b) (1977). After considering the data presented in written submissions and in any hearing held, the Assistant Secretary must publish either a final rule or notification of his decision not to issue a rule.[5]
 
 II
 
 7
 In order to expedite the implementation of OSHA, the Secretary was authorized during the first two years of the Act's effectiveness to forego the promulgation procedures discussed above and instead summarily to adopt "national consensus standard(s)" as health and safety rules.[6] Using this temporary and summary procedure, Labor Department officials in 1972 adopted the standards in the National Electrical Code (NEC) adhered to by the National Fire Protection Association and the American National Standards Institute to cover most "electrical installations and utilization equipment. . . ." 37 Fed.Reg. 3431 (1972), Codified in 29 C.F.R. § 1910.308(c)(vi) (1977). These same standards are made explicitly applicable to construction jobsites by 29 C.F.R. § 1926.400(b) (1977).
 
 
 8
 As adopted under OSHA, the NEC required a three-wire grounding system for protection against ground faults. Under this system, the wiring in all electrical cords, receptacles, and plugs must be trifurcated, with the third wire serving to drain off any electrical leakage to a low-resistance ground path, thereby preventing dangerous shocks. Although relatively simple and effective when implemented properly, this system will not work if the three-wire system is not electrically continuous from outlet to tool. Hence, any tool, extension cord, or outlet with only a two-wire set-up will destroy the utility of the protective system.
 
 
 9
 After the Secretary adopted the NEC under OSHA, an amendment to that consensus code went into effect among its private adherents. That amendment required, in addition to the three-wire system, that outlets at construction sites be installed with ground-fault circuit interrupters (GFCI's). This device measures the flow of electricity out of and back into the outlet and breaks the circuit within one-fortieth of a second whenever there is a significant imbalance in the two flows as occurs when there is leakage of electricity.
 
 
 10
 As part of the NEC, this requirement would have gone into effect on January 1, 1974, under OSHA as well among the NEC's private adherents, but the Assistant Secretary issued a notice a few weeks before that date suspending the effectiveness of the GFCI modification. 38 Fed.Reg. 33397 (1973). The Assistant Secretary took this action after the Advisory Committee recommended the suspension pending further study of the practicability of GFCI's of different "settings"[7] and designs.[8]
 
 
 11
 Although the Advisory Committee had recommended that a "study committee" pursue the matter further, See note 8 Supra, the Assistant Secretary chose instead to suspend the GFCI modification temporarily, in order to solicit public comments and to hold an informal hearing thereon. 38 Fed.Reg. 33983, 35235 (1973).[9] The notices, comments, and hearings focused primarily on the appropriate settings for GFCI's and on whether the requirement should extend beyond temporary construction sites to other industrial sites.[10]
 
 
 12
 By October 1974, the Assistant Secretary was prepared to propose a GFCI requirement for temporary wiring on construction sites, and he accordingly brought his proposal before the Advisory Committee. Once again, however, the Committee was not prepared to give its support. After extensively discussing the proposal, particularly with reference to the alleged insufficiency of the three-wire grounding system, the Committee rejected, by an 8-5 vote, a motion to recommend against the GFCI requirement, but unanimously passed a motion reiterating the Committee's recommendation of an impartial study of the need for and workability of GFCI's. JA at 176, 190. Although expressing some pique that their earlier study proposal had been ignored by the Assistant Secretary, Id. at 178, the members clearly understood the nonbinding nature of their recommendations.[11]
 
 
 13
 As his representative explained to the Committee, the Assistant Secretary was hesitant to conduct the recommended study, due both to insufficient resources and to a desire to follow the statutory notice-comment-and-hearing procedure. JA at 181-82. Nonetheless, the Assistant Secretary did issue another public notice in April 1975, which mentioned the Committee's action prefatory to proposing that the NEC's suspended GFCI requirement be revoked completely. 40 Fed.Reg. 15390 (1977), Corrected, 40 Fed.Reg. 18468 (1977). This notice summarized the arguments for and against the GFCI requirement, and again invited public comment. It was at this stage that the Assistant Secretary first publicly focused attention on possible alternatives to GFCI's, including "regularly testing tools (to) insure that (three-wire protection systems) were operational." 40 Fed.Reg. 15391 (1977).
 
 
 14
 In a subsequent public notice by the Department in September 1975, the tentative references in the April notice to an alternative "assured grounding" system of regularized equipment testing had flowered into a "possible requirement" that might be promulgated by the Department under OSHA, and into one of several issues that would be addressed specifically at an informal hearing. The hearing was also slated to consider the GFCI requirement, suggesting that the Assistant Secretary was now having second thoughts about permanently revoking that requirement. 40 Fed.Reg. 40170-71 (1975).
 
 
 15
 This new round of written comments and oral presentation finally convinced the Assistant Secretary that new standards Were necessary to supplement the three-wire ground fault protection system then required under OSHA. In a December 1976 notification, he reviewed the evidence supporting both the need for additional construction site protection from ground faults (including a finding that about 30 deaths occur annually due to the insufficiency of the three-wire system[12]), and the safety-effectiveness, workability, and cost of GFCI's. This notice also discussed the utility and the necessary elements of an assured grounding system as a back-up to the three-wire system and as a substitute for the GFCI requirement. The Assistant Secretary concluded that the GFCI and assured grounding proposals were equally viable; and both were accordingly promulgated as alternative final standards in the December notice. They became effective on February 22, 1977. 41 Fed.Reg. 55697-704 (1976).
 
 
 16
 The final standards provide that, in addition to three-wire ground-fault protection systems, construction sites Either must install "approved" GFCI's on all 120-volt, 15- and 20-ampere receptacle outlets, Or must institute "assured equipment grounding conductor programs." 29 C.F.R. § 1910.309(c) (1977). Approved GFCI's are defined as those "determined to be safe by a nationally recognized testing laboratory, such as, but not limited to, Underwriters' Laboratories, Inc. (UL) . . . ."[13] Although the GFCI standard does not adhere to the one in the NEC, and does not provide the exact specifications of acceptable GFCI's other than by reference to UL's approval criteria, the Assistant Secretary's explanation in the Federal Register did consider and find acceptable the settings of GFCI's that were UL-approved at the time of promulgation. 41 Fed.Reg. 55702 (1976). See note 7 Supra. The assured grounding program sets forth a rigorous set of (1) tests to be conducted on specified cord sets, attachment caps, plugs, and receptacles as well as of the hand tools themselves, before first use, after repairs, and every three months, and (2) visual inspections to be made daily.
 
 
 17
 At no time after October 1974 until the rule was promulgated did the Assistant Secretary consult the Advisory Committee. Hence, the Committee had no opportunity to comment on the assured grounding program alternative, except as its members, on their own, availed themselves of the various comment and hearing opportunities offered the general public between October 1974 and December 1976. This fact was brought home to Committee members on March 30, 1977, when the Assistant Secretary's designee explained the standards to the Committee After they had gone into effect. The members, after voicing their criticisms of the alternative standards, See note 24 Infra, including complaints that their study proposal had been ignored, were told by a Labor Department official that they, like "(a)nybody(,) can petition for amendments or changes to standards." JA at 874.
 
 
 18
 This petition for review under OSHA was brought by the National Constructors Association, whose members perform about one-third of the dollar value of industrial construction work in this nation. The Association, which took an active role in the rulemaking proceedings, presses three arguments upon us. First, it argues that the Assistant Secretary erred procedurally in promulgating the modified ground fault protection. Next, the Association claims that the Assistant Secretary, by relying on UL to provide the specifications of an approved GFCI, unlawfully subdelegated authority to private individuals. Finally, the Association contends that the standards do not find substantial support in the record, as required by 29 U.S.C. § 660(a). See note 2 Supra.
 
 III
 
 19
 The crux of petitioner's procedural argument is that the Assistant Secretary did not make proper use of the Advisory Committee in promulgating the modified safety standards. As a preface to our consideration of this argument, we may distill three conclusions from the statutory and regulatory background to this suit discussed above. First, consultation with the Advisory Committee on "any proposal" is a prerequisite to valid promulgation under OSHA of any construction-related safety standard. 29 C.F.R. § 1911.10(a) (1970); See note 4 Supra. Although, as relevant here, this requirement is a product of the Department's own regulations, it draws heavily on the legislative policies underlying the Construction Safety Act, See notes 3 & 5 Supra, and reflects an established opinion under OSHA. See 29 U.S.C. §§ 655(b)(1), 655(b)(2); note 2 Supra. Second, while the Assistant Secretary must provide the Committee with the opportunity to issue a recommendation, as well as with whatever information he has that is relevant thereto, he need not await that recommendation indefinitely, but may proceed with rulemaking after a given period of time.[14] Finally, even when the Committee does make a recommendation, the Assistant Secretary need not follow it[15] although the Department's own practice in this and other cases, as well as the case law, support a requirement that the Department publish the substance of the Committee's recommendation in its initial notice of proposed action on a standard or modification. Synthetic Organic Chem. Mfrs. Ass'n v. Brennan, 506 F.2d 385, 388-89 (3rd Cir. 1974), Cert. denied, 423 U.S. 830, 96 S.Ct. 50, 46 L.Ed.2d 48 (1975).
 
 
 20
 In light of these three conclusions, we may quickly dispose of two procedural arguments made by the Association. Because OSHA's advisory-committee-consultation option, as well as the Department's regulation, make clear that the Assistant Secretary need only supply whatever information he has available to him At the time he submits his proposal to the Committee,[16] and because petitioner does not claim that such information was not supplied, the Assistant Secretary cannot be faulted for failing to provide the Committee with the requisite information or, more specifically, for failing to prepare the "impartial study" twice recommended by the Committee. To hold otherwise would be to require the Assistant Secretary to follow the Committee's recommendation, which Congress clearly did not intend. See note 15 Supra and accompanying text.
 
 
 21
 For these same reasons, we are not persuaded that the Assistant Secretary denied the Committee the requisite opportunity to issue a recommendation on the GFCI proposal. With respect to that proposal, Department officials fulfilled their duty to the Committee under the statute and regulation.
 
 
 22
 We are left, therefore, with petitioner's claim that as to the Assured grounding proposal, the Assistant Secretary shirked his duty of consultation with the Committee. Although admitting that nothing like the assured grounding program was ever formally presented to or discussed by the Committee prior to its adoption, See note 26 Infra, the Department insists that it paid sufficient heed to the Committee by twice presenting it with GFCI proposals. Under the Department's view of the procedures mandated by OSHA's advisory committee option and adopted in the Department's regulations, the rulemaking process has a linear quality such that it begins at one point (the Assistant Secretary's proposal) and travels in a straight line through several other statutorily mandated points (Advisory Committee consultation, notice of proposed rulemaking, reception of public comments, hearing), and ends at another point (final promulgation), without ever turning back and passing through any of the points a second time. Hence the validity of the procedures is tested merely by retracing the linear progress of the proposal from its inception to final promulgation, making sure that the right points were reached in the right order.[17]
 
 
 23
 This view of the promulgation process is overly formalistic, and accordingly ignores the purposes of the requisite procedures. The Department officials responsible for adopting the promulgation procedures at issue here presumably expected that every OSHA standard would derive substantial benefit from each step in the prescribed process.[18] This expectation reflects the same view on the part of the drafters of CSA and OSHA, whose mandatory and optional advisory committee provisions, respectively, were the models for the Department's regulations. See note 3 Supra. The legislative history of these two statutes suggests at least three purposes for advisory committee consultation: first, to enable Labor Department officials to take advantage of the expertise of committee members in formulating a wide variety of standards;[19] second, to allow the persons who will be affected by the standards to participate in their promulgation;[20] and third, to enable those same persons to abide by the standards once promulgated.[21] A fourth reason, identified by the Third Circuit, is that the pre-promulgation recommendations of an advisory committee will have a beneficial organizing and educative effect on the public comment and hearing procedure that follows.[22]
 
 
 24
 Because the Department's exiguous use of the Advisory Committee served none of these four purposes with respect to the assured grounding program alternative, "the effectiveness of the educational process which Congress intended (OSHA) to provide for agency rulemaking" was "undermined," and the "latitude for promulgating unwise rules" was accordingly increased.[23] Thus, the Assistant Secretary never availed himself, or apprised public commentators, of the Committee's expert views on the question of whether an assured grounding program could provide a useful supplement to the three-wire grounding system or a valuable alternative to GFCI's.[24] Even more important, he did not seek its views on how to devise a workable assurance program that would provide for the necessary tests without requiring constructors to commit inefficient amounts of resources to scanning the large quantity of tools and electrical transmission equipment found on many construction sites. Moreover, by promulgating the assured grounding program without bringing it to the attention of the industry and labor representatives on the Committee, the Assistant Secretary deprived industry of an important tier of participation in the formulation of and thus of an opportunity better to comprehend and comply with the standards.
 
 
 25
 The Department's linear view of the promulgation process also ignores the language of its own procedural regulation, which in turn utilizes the terms of OSHA itself. Under those provisions, committee consultation must occur as to "Any (construction-related) Proposal " by the Department under authority of OSHA. 29 C.F.R. § 1911.10(a) (1977) (emphasis added), Tracking, 29 U.S.C. § 655(b)(1). This language has two important consequences. First, it establishes committed consultation as a separate step in the promulgation process, and, as such, goes beyond the dictates of traditional informal rulemaking under the APA. See United States v. Finley Coal Co., 493 F.2d 285, 289-90 & n. 4 (6th Cir. 1974). Second, the language places a "stricter" requirement on when, and how often, the agency must utilize the advisory committee procedure than does the APA with respect to public comment during informal rulemaking. Shell Oil Co., supra note 23, 574 F.2d 512, 517.[25] That is to say, the committee must have "sufficient notice of ('any') proposal to be finally adopted (to allow) comment" thereon. Id.
 
 
 26
 The fact that the assured grounding alternative adhered to the APA's informal rulemaking procedure, because it was a "logical outgrowth" of the notice, public comment, and informal hearing administered by the Department, South Terminal Corp. v. EPA, 504 F.2d 646, 659 (1st Cir. 1974), therefore, is of no final consequence in deciding this petition. The alternative assured-grounding proposal, as the Department admits, was never presented to the Committee,[26] nor did it grow logically out of anything that was presented to, or heard from, the Committee.[27] Consequently, consulting the Committee as to the GFCI proposal, and allowing public comment on both that proposal and on the assured grounding program, did not satisfy the requirement that the Assistant Secretary bring "Any " proposal before the Committee.[28]
 
 
 27
 In sum, we are convinced that under the Department's own promulgation regulation, as explained by its statutory models, CSA and OSHA, advisory committee consultation should, but in this case did not, consist of something more than a single and brief rest stop on the route between a tentative proposal of one construction health and safety standard, and the final promulgation of another, superficially related, but substantively quite different, standard.[29] Because the deviation from the requisite procedures is so great, we cannot be sure that the Assistant Secretary would have promulgated the modified ground fault protection standard in its current form had he used the proper process.[30] Accordingly, the modified ground fault protection standard must be remanded to the Department so that it may engage in the appropriate consultation with the Advisory Committee.[31]
 
 
 28
 On the other hand, because we do not find that the standard as promulgated is illegal,[32] nor, upon our initial review of the record, do we see any glaring deficiencies in the evidence supporting that standard,[33] we feel that a minimum ninety-day remand of the record during which the regulations shall remain in effect will suffice to allow the Committee to be convened and to issue any recommendation it chooses on the assured grounding/GFCI alternative standard.[34] If the Committee recommends that the standard should be altered, the Assistant Secretary must reevaluate the final regulation although the final decision as to its contents lies with him. See notes 11 & 15 Supra and accompanying texts. Should he decide to change the standard, a new round of public comment and a hearing on the change would be required If the change is not a "logical outgrowth" of the public comments already received. See pp. ---- - ---- of --- U.S.App.D.C., 970-971 of 581 F.2d, Supra. By the same token, should he be inclined not to follow the Committee's recommendations, he must at least reserve judgment until he has compared those recommendations with the written and oral comments he received from the public during the previous promulgation period: If he decides that the Committee's recommendations might significantly have refocused the public commentary, he must withhold making a final decision until he has issued a new public notice soliciting public comments on the Committee's recommendations, and until he has held a new hearing, if one is requested. See pp. ---, --- of --- U.S.App.D.C., 959, 969 of 581 F.2d, Supra. That is to say, once the Assistant Secretary has convinced himself of the wisdom of a chosen course of action after he has had the benefit of the Committee's recommendations, and once he is convinced that further public comment would shed no new light on the matter, he may return the record to this court for entry of an appropriate order.
 
 
 29
 It is so ordered.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 294(d)
 
 
 [1]
 In relevant part, 40 U.S.C. § 333(a), provides as follows:
 (a) It shall be a condition of each (federal) contract which is entered into under legislation subject to Reorganization Plan Numbered 14 of 1950 . . . that no contractor or subcontractor contracting for any part of the contract work shall require any laborer or mechanic employed in the performance of the contract to work in surroundings or under working conditions which are unsanitary, hazardous, or dangerous to his health or safety, as determined under construction safety and health standards promulgated by the Secretary by regulation based on proceedings pursuant to section 553 of Title 5, provided that such proceedings include a hearing of the nature authorized by said section. In formulating such standards, the Secretary shall consult with the Advisory Committee created by subsection (e) of this section.
 
 
 [2]
 29 U.S.C. §§ 655(b)(3), 655(b)(4), 660(a). See generally Industrial Union Dep't AFL-CIO v. Hodgson, 162 U.S.App.D.C. 331, 499 F.2d 467 (D.C.Cir.1977)
 In relevant part, 29 U.S.C. § 655(b) provides as follows:
 The Secretary may by rule promulgate, modify, or revoke any occupational safety or health standard in the following manner:
 (1) Whenever the Secretary . . . determines that a rule should be promulgated in order to serve the objectives of this chapter, the Secretary may request the recommendations of an advisory committee appointed under section 656 of this title. The Secretary shall provide such an advisory committee with any proposals of his own or of the Secretary of Health, Education, and Welfare, together with all pertinent factual information developed by the Secretary or the Secretary of Health, Education, and Welfare, or otherwise available, including the results of research, demonstrations, and experiments. An advisory committee shall submit to the Secretary its recommendations regarding the rule to be promulgated within ninety days from the date of its appointment or within such longer or shorter period as may be prescribed by the Secretary, but in no event for a period which is longer than two hundred and seventy days.
 (2) The Secretary shall publish a proposed rule promulgating, modifying, or revoking an occupational safety or health standard in the Federal Register and shall afford interested persons a period of thirty days after publication to submit written data or comments. Where an advisory committee is appointed and the Secretary determines that a rule should be issued, he shall publish the proposed rule within sixty days after the submission of the advisory committee's recommendations or the expiration of the period prescribed by the Secretary for such submission.
 (3) On or before the last day of the period provided for the submission of written data or comments under paragraph (2), any interested person may file with the Secretary written objections to the proposed rule, stating the grounds therefor and requesting a public hearing on such objections. Within thirty days after the last day for filing such objections, the Secretary shall publish in the Federal Register a notice specifying the occupational safety or health standard to which objections have been filed and a hearing requested, and specifying a time and place for such hearing.
 (4) Within sixty days after the expiration of the period provided for the submission of written data or comments under paragraph (2), or within sixty days after the completion of any hearing held under paragraph (3), the Secretary shall issue a rule promulgating, modifying, or revoking an occupational safety or health standard or make a determination that a rule should not be issued.
 OSHA's judicial review provision, 29 U.S.C. § 660(a), mandates that "(t)he findings of the Commission with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive."
 
 
 [3]
 29 C.F.R. §§ 1911.10-1911.18, 1912.3 (1977). See note 5 Infra
 The Secretary's desire to devise a procedure that will simultaneously satisfy 40 U.S.C. § 333, under CSA, and 29 U.S.C. § 655, under OSHA, is particularly apparent in the preamble to the regulation promulgated under the latter Act establishing the Advisory Committee on Construction Safety and Health, 29 C.F.R. § 1912.3(a) (1977). In relevant part, the preamble provides:
 This part applies to the Advisory Committee on Construction Safety and Health which has been established under . . . (40 U.S.C. § 333 of the Construction Safety Act). The aforesaid section . . . requires the Secretary of Labor to seek the advice of the Advisory Committee in formulating construction standards thereunder . . . . In view of the far-reaching coverage of the Construction Safety Act, the myriad of standards which may be issued thereunder, and the fact that the Construction Safety Act would also apply to much of the work which is covered by the Williams-Steiger Occupational Safety and Health Act of 1970, whenever occupational safety or health standards for construction activities are proposed, the Assistant Secretary shall consult the Advisory Committee. The composition of the Advisory Committee is consistent with that of the advisory committees which may be appointed under (29 U.S.C. § 656(b) of OSHA).
 See also id. § 1912.3(c).
 
 
 [4]
 29 C.F.R. § 1911.10(a) (1977) (emphasis added). This regulation, in full, provides that:
 The Assistant Secretary shall consult the Advisory Committee on Construction Safety and Health, established pursuant to (40 U.S.C. § 333 of CSA) in the formulation of a rule to promulgate, modify, or revoke a standard. The Assistant Secretary shall provide the committee with any proposal of his own or the Secretary of Health, Education, and Welfare, together with all pertinent factual information available to him, including the results of research, demonstrations, and experiments. The committee shall submit to the Assistant Secretary its recommendations regarding the rule to be promulgated within the period prescribed by the Assistant Secretary, which in no event shall be longer than 270 days from the date of initial consultation.
 
 
 [5]
 Id. § 1911.18(a)(1). While designed to establish one procedure that satisfies both CSA and OSHA, See note 3 Supra and accompanying text, this process quite explicitly allows the Assistant Secretary to promulgate or modify a standard after holding an Informal hearing. 29 C.F.R. § 1911.15(a)(2) (1977). This informality, while sufficient under OSHA, See note 2 Supra and accompanying text, may not adhere religiously to CSA, which apparently requires "formal hearings," pursuant to 5 U.S.C. §§ 553(c), 556, 557. See S.Rep.No. 320, 91st Cong., 1st Sess. (1969), Reprinted in, (1969) U.S.Code Cong. & Admin.News, p. 1073; note 1 Supra and accompanying text
 In other contexts, the Supreme Court has allowed agencies to modify and condense statutorily established procedures where necessary for administrability, and where the purposes of the mandated procedures are achieved. See, e. g., E. I. duPont de Nemours & Co. v. Train, 430 U.S. 112, 131-32 n. 22, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977). We need not decide whether the combined CSA-OSHA promulgation regulation at issue here fits within this rule, however. Petitioner consistently purports to challenge the ground-fault circuit protection standard under OSHA alone, and does not even allege standing to challenge regulations promulgated under CSA, nor would there be jurisdiction to do so originally in this court. See 5 U.S.C. §§ 702, 703. Thus, we believe that petitioner's citation of CSA in its briefs serves the purpose of explaining why certain procedures were written into the combined CSA-OSHA promulgation regulations, without raising the issue of whether those regulations are in fact true to CSA. There is no question raised, moreover, concerning the sufficiency of the promulgation regulation under OSHA; only the Assistant Secretary's adherence to that regulation is at issue.
 
 
 [6]
 29 U.S.C. § 655(a). A consensus standard is one adopted by any national standards-producing organization that considers diverse views and achieves "substantial agreement" among "persons interested and affected" by the standard. 29 U.S.C. § 652(9)
 
 
 [7]
 The setting of a GFCI refers to the degree of outflow and inflow imbalance necessary before the circuit breaker activates. If the setting is too low, "false tripping" may occur by reason of such nondangerous conditions as interference from two-way radios, which may cause minor imbalances and, therefore, power shut-offs. Under such circumstances, the temptation to disconnect the GFCI to allow work to continue without nuisance interruptions increases as, accordingly, does the danger of ground faults. On the other hand, if the GFCI is set too high, shocks of moderate intensity may occur without the circuit breaker being activated. Even if such shocks are not of sufficient intensity to cause electrocution, they may cause workers to fall, or to jerk their arms, which can be exceedingly dangerous on jobsites involving multistory construction work and high-powered tools
 
 
 [8]
 Joint Appendix (JA) at 34-37. In introducing the motion of the Advisory Committee to suspend the GFCI requirement, Member Daley commented: "I think this whole Committee is in favor of GFCI's if we can determine just what GFCI's and what settings are practical to be used." Id. at 34. The Committee, which considered the issue less than two months before the GFCI requirement would have gone into effect, felt that a decision on technical matters could not be made quickly enough to allow implementation of the standard by January 1, 1974. Id. at 33. Its resolution asked the Assistant Secretary to establish a "study committee" to recommend a course of action on GFCI's. Id. at 35
 
 
 [9]
 In explaining his decision to suspend the GFCI requirement, the Assistant Secretary commented: "The recommendation of the Advisory Committee . . . raise(s) serious questions as to whether the GFCI requirement is feasible."
 
 
 [10]
 See also 39 Fed.Reg. 20499 (1974) (further round of notice and comment, in which the Assistant Secretary in mid-1974 proposed and then rejected extending the GFCI requirement beyond construction sites to all damp industrial jobsites)
 
 
 [11]
 Member Connelley commented:
 What we are really saying to you (I. e., to the Assistant Secretary) . . . is that we are not satisfied with the record as it stands. Give us a better one, if you really want a definite decision.
 If not, we know we are an advisory committee, and you can go ahead and do whatever you please . . . and suffer whatever consequences there are, which are none as far as I know of.
 JA at 183.
 
 
 [12]
 Deaths caused by electrical construction accidents were among the explicit concerns of the drafters of OSHA. See A Legislative History of the Occupational Safety and Health Act of 1970, at 1037 (hereinafter referred to as Legislative History ) (accidental death rate for electrical construction workers twice that of coal miners)
 
 
 [13]
 Id. § 1910.308(d)(1)-(2). UL is apparently the only recognized laboratory that tests GFCI's
 
 
 [14]
 Id. § 655(b)(1); 29 C.F.R. § 1911.19(a); See notes 2 & 4 Supra
 Under 29 U.S.C. § 655(b)(2), the Secretary, if he chooses to utilize an advisory committee, must notify the public of any proposed rule "within sixty days after the submission of the advisory committee's recommendations Or the expiration of the period prescribed by the Secretary for such submission" (emphasis added).
 
 
 [15]
 Under the early versions of OSHA, advisory committees were mandatory, and their recommendations became the proposed rule on which public comments were to be accepted pending promulgation of the final rule. H.R. 16785, 92nd Cong., 1st Sess. § 7(a) (1969). See Legislative History, at 940-42. Under the Senate version, which was essentially adopted by the Conference Committee, the Secretary was left with ultimate authority to issue a proposed rule even if he chose as he need not do to seek the recommendations of an advisory committee. S. 2193, 92nd Cong., 1st Sess. § 6(b) (1969). See Legislative History, at 337 (remarks of Sen. Saxbe) ("(C)ommittee . . . has no power itself (and) only can advise.")
 
 
 [16]
 Both the statute, in stating the advisory committee option, and the regulation, in making that option mandatory as to construction safety standards, require Department officials to "provide (the) advisory committee with any proposals . . . Together with all pertinent factual information . . . available . . . ." 29 U.S.C. § 655(b)(1) (emphasis added); 29 C.F.R. § 1911.10(a) (1977) (emphasis added); See notes 2 & 4 Supra. Hence, the measure of the information that must be provided is what materials are available to the Assistant Secretary when he submits his proposal to the Committee. Moreover, by designing the Advisory Committee option as a procedural step that must Precede public notice, comment, and the informal hearing, the drafters of OSHA assumed that the Committee would not be provided with all information that the Labor Department eventually developed on the subject. Nonetheless, by requiring "any proposal" to go to the Committee "together with" supporting data, Congress did assure that any time the Department develops enough new information to change its course significantly with regard to a health and safety standard, the Committee will get a chance to pass on that information and the new proposal. See pp. ---- - ---- of --- U.S.App.D.C., pp. 970-972 of 581 F.2d, Infra
 
 
 [17]
 In support of this view, the Department quotes from National Roofing Contractors Ass'n v. Brennan, 495 F.2d 1294, 1295-96 (7th Cir. 1974), Cert. denied, 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975). The quoted passage, however, purports only to outline briefly the procedures required under OSHA when the advisory committee option is utilized. It does not suggest that a step will never be repeated even if the proposal changes drastically
 
 
 [18]
 Administrative agencies are legally bound by their own regulations. See, e. g., Service v. Dulles, 354 U.S. 363, 372, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957)
 
 
 [19]
 See Legislative History, at 149 (Senate Report); Id. at 850 (House Report); Id. at 1001 (remarks of Rep. Daniels). OSHA equally divides membership on the Committee among representatives of labor and industry who are "qualified by experience", and also provides for participation by designees of the Secretary of Health, Education, and Welfare and by representatives of state health and safety agencies. Moreover, the Secretary may "include such other persons . . . who are qualified by knowledge and experience to make a useful contribution . . .." 29 U.S.C. § 656(b). In establishing the Advisory Committee on Construction Safety and Health, See note 3 Supra, the Secretary took advantage of the authority to appoint persons, other than representatives of labor and industry, "who are qualified by knowledge and experience. . . . " 29 C.F.R. § 1912.3(b)(4). In addition, the establishment of one committee for use in formulating all construction-related standards under CSA and OSHA was explicitly designed to develop advisory expertise. Id. § 1912.3(c)
 
 
 [20]
 See, e. g., Legislative History, at 1074 (remarks of Rep. Steiger). In explaining the composition of the Advisory Committee involved herein, the Secretary stressed the value of "a greater opportunity for representation . . . within the construction industry." 20 C.F.R. § 1912.3(c)
 
 
 [21]
 See S.Rep.No. 320, 91st Cong., 1st Sess., Reprinted in (1969) U.S.Code Cong. & Admin.News, p. 1073 (CSA's advisory committee provision designed "to assist the contractor . . . in meeting the safety and health requirements . . ..")
 
 
 [22]
 Synthetic Organic Chem. Mfrs. Ass'n v. Brennan, 506 F.2d 385, 389 (3rd Cir. 1974), Cert. denied, 423 U.S. 830, 96 S.Ct. 50, 46 L.Ed.2d 48 (1975) (failure to provide time periods mandated by OSHA between consultation of advisory committee, solicitation of public comments, and the holding of a hearing deprived public of committee's "objections, comments and data (that) would have made the public (participation) far more valuable . . ..")
 
 
 [23]
 Shell Oil Co. v. FEA, 574 F.2d 512 (Emer.Ct.App.1978). See Synthetic Organic Chem. Mfrs., supra, 506 F.2d at 388-89
 See also Zeigler Coal Co. v. Kleppe, 175 U.S.App.D.C. 371, 379, 536 F.2d 398, 403 (1976):
 (T)he requirement of consultation with knowledgeable representatives of federal and state government, industry and labor . . . goes far beyond the usual requirements of public notice and an opportunity for comment set forth in the Administrative Procedure Act, and represents the Congressional answer to the fears expressed by industry and labor of the prospect of unchecked federal administrative discretion in the field. These rather unique requirements . . . are an important part of the ultimate legislative compromise, and must be given their due weight.
 The teachings of Zeigler, which arose under the Coal Mine Health and Safety Act of 1969, 30 U.S.C. § 801 Et seq., are especially pertinent to the present case because of the repeated references by OSHA's drafters to the model of the Coal Mine Health and Safety Act. See, e. g., Legislative History, at 434, 468 (remarks of Sen. Williams); Id. at 990 (remarks of Rep. Steiger).
 
 
 [24]
 Indeed, when apprised of the already final standards, members of the Committee pointed out that an assurance program might better have been used to augment the GFCI requirement, in that the danger of accidental or intentional subversion of GFCI's presents as great a threat as does similar subversion of three-wire systems. JA at 867-70, 871-72, 873-74
 
 
 [25]
 Under the APA, an opportunity for public comment need only be afforded on "the terms Or substance of the proposed rule Or . . . the subjects and issues involved." 5 U.S.C. § 553(b)(3) (emphasis added)
 
 
 [26]
 In its brief, the Department concedes that it made "no mention of the (assured) program option" to the Committee, and in fact contends that the information leading it to propose that program was all submitted "subsequent ( )" to its last pre-promulgation consultation with the Committee. Brief for Respondents, at 63-64. But see 40 Fed.Reg. 15391 (1975) (April 1975 notice in which Assistant Secretary reviewed public comments received in late 1973 and mid-1974 I. e., before its last consultation with the Committee including claims that testing programs work better than GFCI's)
 
 
 [27]
 The assured grounding program fundamentally differs from the GFCI proposals that were brought before the Committee. Thus, the former seeks to assure the operability of three-wire systems already in use in contrast to the latter, which essentially assume the frequent inoperability of three-wire systems. The Assistant Secretary as much as admitted these differences in the final promulgation notice, when he referred to the assured grounding program as "a method Other than GFCI's of supplementing the three-wire system." 41 Fed.Reg. 55699 (1976) (emphasis added). Even more indicative of the distinctness of the two alternatives, the Labor Department official who explained the already effective standards of the Advisory Committee gave little attention to GFCI's because "you (committee members) all know what a (GFCI) is," but he elaborated upon the assured grounding program:
 The final standard, however, since (we) determined that an alternative assured grounding conducter program was equally effective as the use of (GFCI's, was) promulgate(d) in the alternative. Probably (the assurance program) sounds complicated . . ., but Once you read the standard . . ., you will see that it may be less complicated than most people think.
 JA at 865-66 (emphasis added).
 The "logical outgrowth" test was developed under the APA to determine how significantly proposals on which public comment have been received may be altered without allowing more public comment. As noted, See note 25 Supra and accompanying text, OSHA and its supporting regulations appear to require the Department to return to the Committee procedure even more often than the analogous language in the APA requires with respect to the notice and comment procedure. We need not decide how much stricter the requirement is under OSHA, however, because in this case even the APA's lower standard was not met.
 
 
 [28]
 The statute and regulation require that Department officials themselves bring the proposal before the Committee. This explicit requirement, as well as the obvious value of face-to-face consultation with the Committee, belies any argument that Committee members were provided the necessary opportunity for consultation by their ability along with the rest of the public to submit comments to the Assistant Secretary
 
 
 [29]
 Although the two alternative standards may be related in terms of a common goal, the relationship is virtually one of opposites in terms of the alternative means of reaching that goal. The Assistant Secretary appears to recognize as much. See notes 26 & 27 Supra
 
 
 [30]
 The potential impact of consultation with the Committee is apparent from the record before us. The Assistant Secretary twice proposed GFCI's to the Committee, twice was denied its endorsement, and thereafter seriously considered dropping the GFCI requirement altogether. Moreover, in his final promulgation notice, the Assistant Secretary went out of his way to respond to the "proper setting" issue, See note 7-8 Supra and accompanying text, that had most troubled the Committee about GFCI's. 41 Fed.Reg. 55702 (1977). Moreover, even when first apprised of the assured grounding program by the Department after the requirement had gone into effect Committee members immediately perceived deficiencies in the program. JA at 866-67. In light of this background, we cannot confidently conclude that Pre -promulgation consultation with the Committee would not have convinced the Assistant Secretary to take a different approach with respect to the assured grounding program
 
 
 [31]
 Although the defect we have identified taints primarily the assured grounding program, the Assistant Secretary apparently conceived of that program, together with the GFCI alternative, as a package, albeit one affording significantly different alternatives, See note 29 Supra. Hence, in remanding part, we feel constrained to remand the whole
 
 
 [32]
 Petitioner claims that the GFCI part of the safety standard illegally subdelegates authority to a private group UL by defining an acceptable GFCI as one that is approved by that group. See note 13 Supra and accompanying text. Whatever the merits of this claim in general, we find it premature on the record before us. Because the Assistant Secretary reviewed and found "suitable" all GFCI's that then bore the imprimatur of UL approval, See 41 Fed.Reg. 55702 (1976), he effectively adopted UL specifications, as they then stood, as his own. As such, he retained control of the process, so that no subdelegation of final authority occurred. Moreover, petitioner concedes that the Department should be able to draw from, and even adopt, the conclusions of any expert body concerned with the health and safety of American workers. What really troubles petitioner is that UL later may change its specifications, and thereby effectively modify the OSHA standard, without any supervision from the Assistant Secretary, and without any opportunity for advisory-committee or public comment thereon. The legality of such an eventuality, however, is not now before us
 
 
 [33]
 It would be a futile gesture at this point finally to evaluate the evidence favoring standards that may be changed. Nonetheless, we do note that the record appears to contain considerable support for the Assistant Secretary's conclusions that the three-wire requirement has not prevented many ground-fault-related deaths each year on construction sites, and that either the GFCI or the assured grounding alternatives could do so. Moreover, while the evidence supporting the conclusion that false, or nuisance, tripping, See note 7 Supra, will not undermine the actual effectiveness of GFCI's may be somewhat weaker, we do note that such evidence exists in the record. See JA 4, 461-64, 635, 639. We are also cognizant of the admonition in the House Report on OSHA that the Secretary should not be paralyzed by conflicting technical evidence. Legislative History, at 848
 
 
 [34]
 OSHA establishes ninety days as an acceptable period of time for deliberation by the Advisory Committee. 29 U.S.C. § 655(b)(1); See note 2 Supra